IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Terry Stewart,                          :
                    Petitioner          :
                                        :
          v.                            :
                                        :
City of Philadelphia (Workers'          :
Compensation Appeal Board),             :    No. 490 C.D. 2024
                    Respondent          :    Submitted: March 4, 2025

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge
          HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY JUDGE FIZZANO CANNON                        FILED: April 15, 2025


          Terry Stewart (Stewart) petitions for review from the April 5, 2024,
order of the Workers' Compensation Appeal Board (Board), which affirmed the
April 7, 2023, order of the Workers' Compensation Judge (WCJ). The WCJ denied
Stewart's reinstatement and penalty petitions on the basis that Stewart had not shown
that his COVID-19 (COVID) was work-related, that the City of Philadelphia
(Employer) had made payments to him in lieu of workers' compensation benefits,
or that Employer violated the Workers' Compensation Act (Act)[1] by unilaterally
stopping those payments. Upon review, we affirm the Board's order.


## I. Factual & Procedural Background

          Stewart is 1 of 15 police officers represented by the same counsel who
have filed similar claims based on the lasting effects of COVID, which they assert
they contracted while working for Employer in late 2020. On March 3, 2022,

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

Stewart filed reinstatement and penalty petitions. Certified Record (C.R.) at 7-9.[2] He asserted that Employer accepted his claim as a matter of law when it paid him wages in lieu of workers' compensation benefits and then violated the Act when it unilaterally terminated those payments. *Id.*

Stewart testified in an August 2022 deposition. C.R. at 111. He was then 58 years old and had been a police officer for Employer for 26 years. *Id.* at 119. In October 2020, during the COVID pandemic, he and other officers were transported regularly in buses to work at protests on 12- to 16-hour shifts. *Id.* at 120-21. While working, he encountered other officers and members of the public who did not wear masks even though there was a citywide mask mandate. *Id.* at 120-21 & 145. He complied with the mandate. *Id.* at 145. His wife worked at home and his children were attending school at home. *Id.* They sanitized inside their home and mostly all stayed in their rooms; he and his wife slept separately because they kept different hours at that time. *Id.* at 146. He believed he contracted COVID at work because he was not going anywhere else at the time. *Id.* at 148.

Stewart recalled that shortly before his diagnosis, he had been working at a protest and did not feel well. C.R. at 122. He told a supervisor, Sergeant Ritner, who let him rest for about 10 minutes then told him to get back on the line because he was needed. *Id.* He would get home and go straight to bed. *Id.* at 124. On October 30th, he went to the hospital where he was diagnosed with COVID and admitted with a very low oxygen level. *Id.* at 125. Nobody in his family or personal acquaintance had COVID before then. *Id.* at 121-22. He went into a coma until mid-December 2020 and had to relearn how to walk and talk in a rehabilitation facility. *Id.* at 126-28. When he came home in January 2021, another supervisor,

---

[2] C.R. references are to electronic pagination.

Sergeant Litner, visited him. *Id*. at 132. Stewart told her he believed he contracted COVID while working at the protests. *Id*. at 129 & 147. He also told Sergeant Ritner. *Id*. They told him not to worry and that he would be put on "COVID E Status." *Id*.

Stewart stated that around the same time, Lieutenant Rogers, his executive lieutenant, told him that he did not need to fill out paperwork reporting his condition because the COVID coverage would "carry over" for him. *Id*. at 149 & 152. Stewart knew that the pay he was getting then was not the standard "injured on duty" (IOD) pay.[3] *Id*. at 150. His medical bills were paid, and he believed that he was okay because Employer was "still taking care of me about this." *Id*. at 152. Lieutenant Rogers told him that Employer "came up with this COVID E thing, that they were covering everybody with COVID E" status and not putting those cases through IOD. *Id*. at 153. He was paid his full salary and did not have to use sick or vacation time. *Id*. at 130.

In January 2022, Employer issued Stewart a notice of compensation denial (NCD). C.R. at 132. The NCD acknowledged notice of Stewart's alleged work-related exposure to COVID as of October 30, 2022, but denied that his condition was work-related. *Id*. at 461-62. His benefits ended in early March 2022, and he had been using his sick and vacation time since then.[4] *Id*. at 133. As of the August 2022 deposition, he was still not well enough to return to work. *Id*. at 131.

---

[3] IOD pay for police officers is not identical to workers' compensation benefits but resembles them in that receipt is predicated on an injury being work-related by occurring in the line of duty. *Gunter v. Workers' Comp. Appeal Bd. (City of Phila.)*, 825 A.2d 1236, 1239 (Pa. 2003).

[4] As will be addressed shortly, Stewart received "excused time" (E-time) benefits through January 2022 and another 60 days of benefits through March 2022 based on Act 17, Act of April 29, 2020, P.L. 118, No. 17, 35 Pa.C.S. § 57A01-57A02 (Act 17).

3

He was treating with his primary doctor, who had prescribed various medications. *Id*. at 132 & 155-56.

In August 2022, Barry Scott (Scott) testified for Employer in a deposition that would apply to the officers in Stewart's group. C.R. at 203. Scott has been Employer's risk manager and deputy finance director for risk management since 2003. *Id*. at 204. Employer works with a third-party administrator, PMA, for employee injury and disability issues. *Id*. Standard procedure is for injured police officers to report to their supervisors and complete a "City of Philadelphia Accident, Injury, Illness" (COPA II) form for PMA review. *Id*. at 205. Although Employer worked through various approaches to addressing employees with COVID, there was no formal break from the requirement to submit a COPA II form. *Id*. at 210. However, Employer used an "excused time" (E-time) designation for cases that arose during the early months of the pandemic. *Id*.

Scott explained that E-time "is a timekeeping tool that . . . enables an employee to continue to receive their salary when they can't or they're not at work for whatever reason. . . . [I]t is a way to let the people get paid" and not sustain an adverse impact due to their missed time. C.R. at 210-11. The employee receives his regular pay, is not charged for time off, and continues to accrue benefits. *Id*. at 211. Scott stated that Employer's use of E-time for police officers during the pandemic was not an acknowledgement that they contracted COVID at work. *Id*. He noted that in April 2020, the Commonwealth also passed Act 17, which granted up to 60 days of paid sick leave for police and other essential workers with COVID, but that was separate from E-time. *Id*. at 212.

Scott recalled that in early 2022, Employer became aware that multiple police officers like Stewart were still out with COVID issues. C.R. at 213. Some

4

had not submitted COPA II forms. *Id*. at 214. Employer decided to "move" these officers to Act 17 status, which unlike E-time was specific to COVID cases. *Id*. Once these officers used their 60 days of Act 17 time, they would have to use sick or personal time if they were not yet able to return to work. *Id*. at 215. At that point, the officers, including Stewart, filed the present petitions. *Id*.

Scott was not aware that until July 2022, Employer did not have a specific policy instructing police supervisors to have officers asserting work-related COVID fill out a COPA II form. C.R. at 220. He did not know that some supervisors told officers that they would get E-time pay while out with COVID and that they did not need to complete a COPA II form; he stated that supervisors would not have been told that by his department. *Id*. at 242.

Scott did not know whether PMA investigated the claims of any officers in Stewart's group but believed that PMA had contacted some officers who said that their COVID was not work-related. C.R. at 225 & 228-30. He did not know whether PMA had issued any notices of compensation payable (NCPs) accepting claims for officers who contracted COVID. *Id*. at 233. He declined to say whether any of the 6,000 reported COVID cases among officers were work-related. *Id*. He did not know how many officers were transported to protests together in vans or buses, how many officers who worked closely together got COVID, or anything about any similarly situated officers' claims or cases. *Id*. at 234. His department did not track or monitor who got E-time pay or for how long they received it because that is "really a personnel function." *Id*. at 235.

Scott stated that federal Occupational Safety and Hazard Administration (OSHA) regulations do not apply to Employer and declined to opine on an OSHA provision stating that COVID is likely to be work-related when several

5

cases develop among workers who work closely together or in "frequent close exposure to the general public" and where there is no alternate explanation. C.R. at 226-27.

In August 2022, Lieutenant Donald Lowenthal (Lowenthal) testified for Employer at a deposition that would apply to the officers in Stewart's group. C.R. at 258. He has been the police department's infection control officer since 2007. *Id*. at 264. He is also a registered nurse who works 1-2 shifts at Jefferson Hospital each week. *Id*. at 265 & 267. Before the pandemic, his work mostly involved coordinating care for officers who encountered potentially dangerous bodily fluids on the job. *Id*. at 266. When the pandemic began and before policies were in place, he helped officers understand the symptoms and get tested. *Id*. at 268. Once policies were issued, he interpreted them for officers and answered questions. *Id*.

During the relevant period, Lowenthal advised supervisors that Employer's policy was to designate E-time payment status for officers out with COVID regardless of the asserted cause. C.R. at 277. He did not personally investigate any cases to determine cause. *Id*. He did not tell supervisors to forego filing a COPA II form if an officer asserted his COVID was work-related. *Id*. at 278-79. He did not recall a supervisor asking him whether to file a COPA II form for an officer, but he would have told any such supervisor to complete the form. *Id*. at 282.

Lowenthal acknowledged that Employer did not expressly require a COPA II form for assertions of work-related COVID until July 2022. C.R. at 284. Supervisors were not given instructions or a policy on how to determine whether COVID exposure was work-related. *Id*. at 292. He was not consulted on the

6

potential COVID implications of transporting officers in vans and buses to work protests or of them working those protests. *Id*. at 293 & 298. He had no role in any decisions about E-time or how officers who were still suffering with COVID-related issues in early 2022 and were unable to return to work would be treated. *Id*. at 299.

On April 7, 2023, the WCJ issued a decision and order denying Stewart's reinstatement and penalty petitions. C.R. at 23-32. On April 5, 2024, the Board issued a decision and order affirming the WCJ's determinations. *Id*. at 64-79. Stewart timely appealed to this Court.

## II. Issues

Stewart argues that Employer's use of E-time constituted payments in lieu of benefits that amounted to an acknowledgement that Stewart's COVID was work-related and an acceptance of liability for his condition. *See* Petition for Review at 1-2. He also asserts that Employer's failure to file workers' compensation Bureau documents accepting or denying Stewart's claim within 21 days of notice in October 2020 and its stoppage of benefits in early 2022 violated the Act such that a penalty was warranted. *Id*. Lastly, he avers that the administrative tribunals' determinations were inconsistent with the Act's humanitarian purposes. *Id*.

## III. Discussion

### A. Reinstatement: Notice and Payments in Lieu of Benefits

In the reinstatement context, the claimant "must prove that his or her earning power is once again adversely affected by his or her disability, and that such disability is a continuation of that which arose from his or her original claim." *Bufford v. Workers' Comp. Appeal Bd. (N. Am. Telecom)*, 2 A.3d 548, 558 (Pa.

2010).[5]  The WCJ has exclusive authority to act as fact finder, determine the credibility of witnesses, and weigh the evidence; those findings will not be disturbed if they are supported by substantial, competent evidence.  *Rogele, Inc. v. Workers' Comp. Appeal Bd. (Hall)*, 198 A.3d 1195, 1204 (Pa. Cmwlth. 2018).  The WCJ may reject the testimony of any witness in whole or in part, even if that testimony is uncontradicted.  *Serrano v. Workers' Comp. Appeal Bd. (Chain Bike Corp.)*, 718 A.2d 885, 889 (Pa. Cmwlth. 1998).  Where record evidence supports a WCJ's factual or credibility determination, it will be sufficient "even if it may not be the only possible conclusion."  *W. Penn Allegheny Health Sys., Inc. v. Workers' Comp. Appeal Bd. (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021).

### 1. Notice

This case does not present the issue of notice in the usual sense, where Sections 311 and 312 of the Act require the injured worker to advise the employer of his or her injury and its work-relatedness within 120 days of the injury to be eligible for benefits in the first place.  *See* 77 P.S. §§ 631, 632.  In the reinstatement context, the facts usually entail a previously compensated work-related injury, so notice is not warranted.  *See Bufford*, 2 A.3d at 558.  However, because Stewart seeks reinstatement on the basis that Employer's E-time payments constituted wages in lieu of benefits, he was required to show notice here.  This Court recently addressed this issue in another case pertaining to a member of Stewart's group, explaining:

---

[5] Our review in a workers' compensation appeal is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated.  *City of Scranton v. Workers' Comp. Appeal Bd. (Roche)*, 909 A.2d 485, 486 (Pa. Cmwlth. 2006).

8

While the WCJ did not make specific findings of fact regarding notice, the Board found that [the c]laimant had failed to prove that he provided notice to Employer that he had developed [COVID] at work. The Board stated that "[a]lthough the establishment of notice is not part of [the claimant's] burden of proof in a reinstatement or penalty petition, [the claimant] had not yet established a compensable claim when those petitions were filed. Therefore, the onus was on [the claimant] to establish that [Employer] had actual knowledge of a compensable injury under the Act."

[The claimant] argues that there is nothing in the record to contradict his testimony that he advised Employer that he believed he contracted [COVID] at work. However, [the claimant] did not present testimonial evidence from his supervisor nor did he fill out the COPA II form required by his Employer indicating that he had suffered a work-related injury. As the Board noted, "[the claimant] failed to present the necessary medical evidence to establish the causal relationship between his work activities and disability . . . ." The WCJ acknowledged that [the claimant] testified that he told his supervisor that he contracted [COVID] on the job. However, as noted by the Board, although the WCJ found [the claimant's] testimony to be generally credible, the WCJ did not credit [Brown's] testimony indicating that his [COVID] symptoms were due to work-related exposure to the virus. We note that "[i]t is the claimant who bears the burden of proof on the issue of notice. The notice requirement is met when the employer has actual knowledge of a compensable injury." "Where the nexus between the injury and its causal relationship with work is not clear, the employer cannot be charged with notice that the injury was work related." We therefore affirm the Board's determination on this issue.

*Brown v. City of Phila. (Workers' Comp. Appeal Bd.)*, 330 A.3d 12, 18-19 (Pa. Cmwlth. 2025).

The record here includes Stewart's testimony that after he was released from the hospital in January 2021, he told his supervisors that he got COVID on the

9

job. C.R. at 129. They told him not to worry about completing paperwork to report his condition as work-related because he would be taken care of and placed on "COVID E Status." *Id*. at 147-53. Stewart refers to his uncontradicted testimony as valid verbal notice to Employer of his condition and belief that it was work-related. Stewart's Br. at 18. He notes that Employer did not require employees with COVID to complete a COPA II form during the relevant period. *Id*. at 29-30. He adds that Employer's NCD, which states that it received notice on the date of his hospitalization (October 30, 2020), confirms the sufficiency of his notice. *Id*. at 33. Employer responds that the Board properly affirmed the WCJ's determination that Stewart's notice was insufficient.

The WCJ credited Stewart's testimony generally but expressly rejected it "to the extent he may have identified any specific source or cause of his exposure to [COVID] or any opinion that his symptoms were due to a work-related exposure to the virus or any other medical opinions offered by [Stewart]." C.R. at 30. The Board affirmed on this issue, noting the WCJ's exclusive authority over credibility determinations. *Id*. at 75.

The WCJ's rejection of Stewart's uncontradicted but also uncorroborated testimony that he told his sergeants that he got COVID on the job was within the WCJ's purview, particularly in the unique procedural posture of these cases. *Serrano*, 718 A.2d at 889. In another recent case involving an officer in the group, we also rejected Stewart's argument that Employer's 2022 NCD indicating a late 2020 date of notice confirmed the sufficiency of that notice. *Clarke v. City of Phila. (Workers' Comp. Appeal Bd.)* (Pa. Cmwlth., No. 508 C.D. 2024, filed Jan. 17, 2025), slip op. at 14, 2025 WL 228448, at *6 (unreported) (stating that "the NCD reflected that Employer had been advised of [Clarke's] COVID diagnosis, but that

10

Employer **denied** that such diagnosis was work-related. Accordingly, this is not a basis to reverse the denial of the Reinstatement Petition.") (emphasis in original and citation omitted).[6] Given the foregoing, we may not disturb the WCJ's determination that Stewart did not establish sufficient notice to Employer in the context of this case.

However, even if the WCJ concluded that Stewart had sufficiently notified Employer of his belief that his condition was work-related, the more important question would be what Employer did with that knowledge in late 2020 and early 2021. We address that issue next.

## 2. Wage Payments in Lieu of Compensation

"Payments in lieu of compensation are any voluntary or informal compensation, apart from the Act, paid with the intent to compensate for a work-related injury." *Kelly v. Workmen's Comp. Appeal Bd. (DePalma Roofing)*, 669 A.2d 1023, 1026 (Pa. Cmwlth. 1995). If, after receiving notice that a worker is injured, the employer does not file an NCD within 21 days but begins paying the worker in some way, a presumption arises that the employer has admitted and accepted liability as if it had formally complied with the Act and issued an NCP.[7]

_____

[6] Under Section 414(a) of this Court's Internal Operating Procedures, an unpublished memorandum opinion of this Court issued after January 15, 2008, although not binding precedent, may be cited for its persuasive value. 210 Pa. Code § 69.414(a).

[7] The Board pointed out a statutory exception to this presumption. C.R. at 68. Section 315 of the Act provides that if payments are made to a disabled employee pursuant to "an established plan or policy of insurance for the payment of benefits on account of non-occupational illness or injury and which payment is identified as not being workmen's compensation," those payments "shall not be considered to be payment in lieu of workmen's compensation, and such payment shall not toll the running of the Statute of Limitations." 77 P.S. § 602. Section 315 is generally limited to the context of untimely claim petitions and usually arises in the context of short-term or

11

*NUS Corp. v. Workmen's Compensation Appeal Bd. (Garrison)*, 547 A.2d 806, 810 (Pa Cmwlth. 1988). In these circumstances, the employer cannot subsequently deny compensability. *Kelly*, 669 A.2d at 1026-27.

However, the presumption is rebuttable, and "[i]t is the intent of the payment, not the receipt thereof, which is relevant." *NUS Corp.,* 547 A.2d at 810. If the employer can show that the payment was not intended to replicate workers' compensation benefits, then the employer may deny compensability. *Id*.; *see also Findlay Twp. v. Workers' Comp. Appeal Bd. (Phillis)*, 996 A.2d 1111, 1118 (Pa. Cmwlth. 2010) (stating that intent is the "critical legal element" in this inquiry and concluding that "all of the evidence" in that case showed the employer's intent "was *not* to compensate" the claimant for a work-related injury) (emphasis in original).

In *Mosgo v. Workmen's Compensation Appeal Board (Tri-Area Beverage, Inc.)*, 480 A.2d 1285 (Pa. Cmwlth. 1984), the claimant's doctor advised the employer that the claimant's on-duty heart attack resulted from "strenuous duty." *Id.* at 1286. The employer did not file Bureau documents but issued the claimant an "initial compensation-check" along with a memo explaining that the payment was for the claimant's heart attack. *Id.* This Court held that the employer was required to "pay compensation with the same legal effect" as if it had complied with the Act and issued Bureau documents. *See also Kelly*, 669 A.2d at 1026 (concluding that

---

long-term disability plans that are part of an employee's overall benefits package. *See Bergmeister v. Workmen's Comp. Appeal Bd. (PMA Ins. Co.)*, 578 A.2d 572, 575 (Pa. Cmwlth. 1990). Here, the Board stated, as alternative grounds for its affirmance of the WCJ's order, that Employer's payments of E-time, which existed prior to the pandemic, could be construed as being made pursuant to "an established plan or policy of insurance for the payment of benefits on account of non-occupational illness or injury and which payment is identified as not being workmen's compensation," in which case they would not be recognized as payment in lieu of workmen's compensation. C.R. at 73 n.6. However, as neither party raises this theory, we address it no further here.

the employer's verbal acknowledgement that another employee probably assaulted the claimant and payment of the claimant's mortgage and weekly sums to the claimant's wife constituted acceptance of work-relatedness and liability).

This issue is central to the recent cases brought by members of Stewart's group, particularly *Brown*, which is on all fours with this case. Like here, the officer in *Brown* asserted that he told Employer his COVID was work-related and he received E-time payments through January 2022, when Employer issued an NCD denying work-relatedness. 330 A.3d at 14. The officer then filed a reinstatement petition asserting that Employer's E-time payments constituted wages in lieu of benefits reflecting Employer's acceptance of liability. *Id*. Scott and Lowenthal's "global" depositions were entered into evidence along with the officer's testimony. *Id*. at 15-17. The WCJ denied the officer's petitions; and the Board affirmed. *Id*. at 15.

This Court concluded in *Brown* that Scott and Lowenthal's testimony constituted substantial evidence that Employer's E-time payments were not intended to be in lieu of workers' compensation benefits because Employer made E-time payments to other workers with COVID regardless of work-relatedness. 330 A.3d at 17-18. We also distinguished *Mosgo* because there, the evidence showed that the employer intended to compensate the claimant for the reported injury. *Id*. Accordingly, we upheld the denial of Brown's petitions. *Id*. at 19-20.

Similarly, in *Clarke*, we distinguished *Mosgo* and *Kelly* because "the employer's intent for the payments, that they were made in lieu of compensation based on a work-related injury, was apparent from the circumstances." Slip op. at 14-15, 2025 WL 228448, at *6. As in *Brown*, the evidence in *Clarke* showed that Employer's E-time payments were not in lieu of workers' compensation benefits

13

because the same payments "were made to all employees who were diagnosed with COVID, not just those whose COVID was claimed to be work related." *Id*. at 15-16, 2025 WL 228448, at **6-7. Accordingly, we affirmed the WCJ and Board's denial of Clarke's petitions. *Id*. at 16-17, 2025 WL 228448, at **6-7.

Most recently, in *Bolds v. City of Philadelphia (Workers' Compensation Appeal Board)*, ___ A.3d ____, ____, (Pa. Cmwlth., No. 488 C.D. 2024, filed February 25, 2025), 2025 WL 595736, at **4-8 (Pa. Cmwlth. 2025), the officer contracted COVID-19 in early 2020, told his supervisor that he believed it was work-related, and was placed on E-time through early March 2022, when he was still disabled with multiple conditions but had to begin using his accrued personal time off. *Id*. at ____, 2025 WL 595736, at *1. On the officer's reinstatement and penalty petitions, the WCJ and Board both concluded that the E-time payments were not in lieu of workers' compensation benefits. *Id*. at ____, 2025 WL 595736, at **2-3. This Court agreed, distinguishing *Mosgo* and *Kelly* because the employers in those cases acknowledged the compensatory nature of their payments. *Id*. at ____, 2025 WL 595736, at *7. In *Bolds*, by contrast and as in the other cases in this "class," Employer disputed that characterization as well as the work-relatedness of the officer's condition, and this Court concluded that Employer's position was supported by substantial record evidence, including the credible testimony of Scott and Lowenthal. *Id*. at ____, 2025 WL 595736, at *7.

Here, the record includes Stewart's testimony that when he spoke with his sergeants after being released from the hospital in early 2021, they told him not to worry and that he would be put on "COVID E Status." C.R. at 129 & 147. He was paid his full salary and did not have to use sick or vacation time. *Id*. at 130. Around the same time, Lieutenant Rogers told him that he did not have to fill out

14

paperwork reporting his condition because Employer "came up with this COVID E thing, that they were covering everybody with COVID E" status, which would "carry over" for him. *Id*. at 149-53. He knew that the pay he was getting at that time was not the standard IOD pay. *Id*. at 150. His medical bills were paid, and he believed that he was "okay" because Employer was "still taking care of me about this." *Id*. at 152.

The record also includes Scott's testimony that Employer used E-time for all employee COVID cases during the relevant period. C.R. at 210. He explained that E-time was not meant to be construed as an acceptance of work-relatedness; it was simply an administrative timekeeping designation that enabled Employer to keep paying those employees during their illnesses without making them use accrued paid time off. *Id*. at 211-12. In early 2022, Employer switched police officers who were still out with COVID to Act 17 status, which provided an additional 60 days of benefits for law officers without reference to causation or work-relatedness. *Id*. at 214; *see also* 35 Pa.C.S. § 57A02. Similarly, Lowenthal testified that during the relevant period, officers out of work with COVID received E-time payments regardless of whether their condition was asserted or deemed to be work-related. *Id*. at 277.

The WCJ did not credit Stewart's assertion that he contracted COVID while on duty and further found Scott and Lowenthal credible as to Employer's policies and procedures during the pandemic, including their consistent testimony that E-time was paid to all employees with COVID, regardless of work-relatedness. C.R. at 30-31. The WCJ acknowledged the complexities faced during the pandemic by workers like Stewart. *Id*. at 31. However, the WCJ determined that Employer's payment of E-time to workers like Stewart was not intended to serve as an

acknowledgement that their COVID was work-related or as payment in lieu of workers' compensation benefits. *Id.* The WCJ concluded that because Employer had never accepted liability, there was nothing to reinstate, and Stewart had not met his reinstatement burden; even if his petition was treated as a claim petition, he had not met his burden to show work-relatedness. *Id.* The Board agreed and affirmed. *Id.* at 76-77.

Stewart relies on *Mosgo* and *Kelly*, noting that in those cases as here, the employer paid the claimant without issuing Bureau documents either accepting or denying the claim within 21 days of receiving notice, as required by the Act. Stewart's Br. at 20-23. Stewart also questions the competency of Scott's testimony regarding Employer's intent when paying E-time to Stewart and the other similarly situated officers; Stewart characterizes Scott's testimony as "generic" and lacking in evidence of intent because Scott was not directly involved with and had no specific knowledge of the police department's handling of COVID cases during the relevant period. *Id.* at 27-28.

Employer responds that the WCJ and Board correctly distinguished *Mosgo* and *Kelly*, discredited Stewart's uncorroborated attribution of his condition to his job, and credited Scott's and Lowenthal's testimony that the E-time payments received by employees who contracted COVID during the relevant period, including Stewart, were not based on work-relatedness and not intended to replicate workers' compensation benefits. Employer's Br. at 18-25.[8]

Here, even if Employer's failure to issue Bureau documents and E-time payments to Stewart had given rise to the presumption of compensability set forth in *NUS Corp.*, and even if Stewart's notice to Employer had been deemed sufficient

---

[8] References to Employer's brief, which lacks page numbers, are based on electronic pagination.

to convey his belief that his COVID was work-related, the record contains sufficient evidence to support a conclusion that Employer rebutted the presumption. Employer's evidence, which is identical to that presented in *Brown*, *Clarke*, and *Bolds*, supports the administrative tribunals' determinations that Employer's E-time payments were not intended to serve as wages in lieu of benefits because they were made to all employees who contracted COVID regardless of causation. Part of Stewart's testimony that was not discredited by the WCJ supports that conclusion as well. He stated that even though he told his supervisors that he believed his COVID was work-related, he learned from Lieutenant Rogers in early 2021 that he was not receiving IOD pay because Employer "came up with this COVID E thing, that they were covering everybody with COVID E" status, which suggests a contemporary understanding that Employer's E-time payments were not based on work-relatedness.

We also agree with the WCJ and Board that *Mosgo* and *Kelly* are distinguishable. In those cases, the employer did not issue Bureau documents and paid the injured workers, but the records included evidence establishing that they expressly accepted the workers' injuries as work-related; accordingly, the payments those employers made constituted wages in lieu of workers' compensation benefits and served as acceptances of liability. Here, as noted, Scott's and Lowenthal's testimony established the contrary: Employer paid E-time to all employees who caught COVID during the relevant period, regardless of whether work-relatedness was asserted; without that distinction, the payments cannot reasonably be deemed in lieu of compensation.

Given the foregoing, the record supports the WCJ's finding that Employer never admitted liability or work-relatedness as to Stewart's condition and

17

that its E-time payments were not intended to be wages in lieu of workers' compensation benefits. The WCJ did not err in concluding that Stewart did not meet his burden of proof in this regard, and that there was "nothing to reinstate," and in denying Stewart's petition. C.R. at 30; *see also Bolds*, ___ A.3d at ____, 2025 WL 595736, at *7; *Brown*, 330 A.3d at 18-19; *Clarke*, slip op. at 16, 2025 WL 228448, at *7.

## B. Penalty Petition

Section 435(d) of the Act authorizes penalties against an employer who violates the Act or its regulations. 77 P.S. § 991(d).[9] Claimants seeking a penalty bear the initial burden of proving that a violation of the Act or regulations has occurred. *Shuster v. Workers' Comp. Appeal Bd. (Pa. Hum. Rels. Comm'n)*, 745 A.2d 1282, 1288 (Pa. Cmwlth. 2000).

Stewart presents the same bases for penalties here as in *Clarke*, where we addressed them as follows:

> [The claimant] also argues the WCJ erred in denying the Penalty Petition because Employer had accepted liability for a work-related injury, and Employer violated the Act by unilaterally terminating the payments for his work-related injury. [The claimant] further asserts that Employer violated the Act by not issuing an official notice either accepting or denying the work-related claim within 21 days of [the claimant] advising Sergeant Dayton of his work-related illness via text. While Employer does not directly address these claims, its arguments that it did not accept any work-related injury, and that [the claimant] did not advise Employer of the work-relatedness of the injury can also apply to these claims.

---

[9] Added by the Act of February 8, 1972, P.L. 25.

18

> To meet his burden of proof on the Penalty Petition, [the claimant] had to establish that Employer violated the Act or its regulations by ending his E-time payments. Because [the claimant] did not prevail on his arguments on the Reinstatement Petition, he also cannot prevail on his claims that Employer violated the Act and that the WCJ erred in denying the Penalty Petition.

Slip op. at 16, 2025 WL 228448, at *7 (citation omitted); *see also Bolds*, ___ A.3d at ____, 2025 WL 595736, at *7; *Brown*, 330 A.3d at 19 (same). Here, similarly, Stewart's failure to show that the WCJ erred in denying his reinstatement petition resulted in a corresponding failure to show that Employer's failure to issue timely Bureau documents and subsequent stoppage of its E-time payments to Stewart violated the Act. Accordingly, we conclude that here, as in *Brown*, *Clarke*, and *Bolds*, the WCJ did not err in denying the penalty petition and the Board did not err in affirming the WCJ's denial. *See* C.R. at 7, 31 & 77-78.

### C. The Act's Humanitarian Purposes

As Stewart correctly asserts, the Act is "remedial in nature and intended to benefit the worker" and "must be liberally construed to effectuate its humanitarian objectives." *Tooey v. AK Steel Corp.*, 81 A.3d 851, 860 (Pa. 2013). Although we are guided by this policy, it cannot be the sole basis for disposition of an appeal because the Act also represents a compromise of the interests of employees and employers, the "Grand Bargain" in which injured workers historically gave up the right to sue their employers in tort in return for certain, but reduced, benefits and employers "embraced a no-fault system . . . in return for the elimination of trial by jury, and the potential of punitive damages and exorbitant unexpected costs." *Herold v. Univ. of Pittsburgh*, 329 A.3d 1159, 1182 (Pa. 2025).

The historical understanding of workers' compensation as remedial and humanitarian but also as a compromise retains its vitality. *DiPaolo v. UPMC Magee Women's Hosp. (Workers' Comp. Appeal Bd.)*, 278 A.3d 430, 440 (Pa. Cmwlth. 2022) (stating that the General Assembly engaged in "similar balancing" when drafting Act 111 of 2018[10] to credit employers for past disability payments while making other changes favorable to claimants). For this reason, recourse to policy considerations in workers' compensation matters is generally limited to matters necessitating a "borderline" interpretation of the Act. *Tooey*, 81 A.3d at 858, 860. Here, resolution of this matter does not entail a borderline interpretation of the Act's language or intent. The administrative tribunals determined, and we have no basis to disagree, that Stewart failed to meet his reinstatement and penalty burdens of proof. As there is no legal underpinning for relief in this matter, the Act's goals have not been violated.

## IV. Conclusion

For the foregoing reasons, the Board's order affirming the WCJ's denial of Stewart's reinstatement and penalty petitions is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

Judge Dumas did not participate in the decision of this case.

_____

[10] Act of October 24, 2018, P.L. 714, 77 P.S. § 511.3. Act 111 restored the impairment rating evaluation (IRE) to the Act after the former IRE provision was struck as unconstitutional in *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 161 A.3d 827 (Pa. 2017).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Terry Stewart,             :
          Petitioner      :
                            :
       v.                :
                            :
City of Philadelphia (Workers'     :
Compensation Appeal Board),      :     No. 490 C.D. 2024
           Respondent     :

# **O R D E R**

AND NOW, this 15th day of April, 2025, the April 5, 2024, order of the Workers' Compensation Appeal Board is AFFIRMED.

_____

CHRISTINE FIZZANO CANNON, Judge